UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
-----------------------------------------------------------x

STARR INDEMNITY AND LIABILITY
COMPANY,

                 Plaintiff,                     20-cv-3172 (PKC)

     -against-                      FINDINGS OF FACT
                                        AND CONCLUSIONS OF LAW

CHOICE HOTELS INTERNATIONAL, INC.,

                 Defendant.
-----------------------------------------------------------x

CASTEL, U.S.D.J.

        An action commenced in the District of South Carolina alleged that defendant

Choice Hotels International, Inc. ("Choice") was liable for a brutal incident of human trafficking

that occurred on the premises of a Quality Inn. See B.H. v. Choice Hotels International, Inc., 19

Civ. 3442 (D.S.C.) (the "B.H. Action"). B.H. alleged that through use of force and violence, she

was held captive at the Quality Inn and forced to engage in sex acts with paying customers, and

that, based on the circumstances of her captivity, Choice "knew or should have known" of the

trafficking venture and her forced captivity.

        Plaintiff Starr Indemnity and Liability Company ("Starr") issued comprehensive

general liability policies to the franchisee of that Quality Inn. The policies named Choice as an

additional insured. Choice timely demanded that Starr defend and indemnify it in the B.H.

Action. Starr disclaimed coverage, asserting that because B.H. was within the "care, custody or

control" of Choice, coverage was excluded under an Abuse or Molestation Exclusion.

        Starr then commenced this declaratory judgment action. It seeks a declaration

that it has no duty to defend or indemnify Choice. In a counterclaim, Choice seeks a declaration

that Starr has wrongfully disclaimed coverage.  While this case was pending, the <u>B.H.</u> Action was dismissed without prejudice.  Choice no longer seeks indemnification from Starr, and the parties' remaining dispute is whether Starr had a duty to defend Choice in the <u>B.H.</u> Action.

On May 18, 2021, this Court held a bench trial on the issue of Starr's duty to defend.  Each side called two witnesses.[1]  Twenty-two exhibits were received into evidence.

The following are the Court's findings of fact and conclusions of law:

1.      The plaintiff in the <u>B.H.</u> Action filed her complaint on December 9, 2019, and named Choice as the sole defendant.  (PX C.)  The Complaint describes the violent sex trafficking of B.H., which occurred principally at the Quality Inn Fort Jackson Maingate hotel in Columbia, South Carolina.  (<u>Id.</u>)  That Quality Inn was operated by Maniben, LLC ("Maniben"), a franchisee of Choice.  (Stipulation of Fact ¶ 3.)

2.      B.H. asserts that she had gone on a date with a man who later invited her to his room at the Quality Inn, where the man and two accomplices accosted her.  (Compl't ¶ 4.)  The man forcibly raped B.H., after which he and his accomplices demanded that she engage in commercial sex on their behalf because "they now owned her."  (<u>Id.</u>)  She alleges that she was held captive at the Quality Inn for approximately three weeks, where she was raped and required to sexually service paying customers.  (<u>Id.</u> ¶¶ 4, 50.)  B.H. alleges that at one point she fled the premises, but that "a few days later" her three traffickers abducted her off the street, forcibly returned her to the hotel, and continued to force her to engage in sex for money.  (<u>Id.</u> ¶¶ 51-55.)

3.      The Complaint graphically details aspects of B.H.'s captivity and the circumstances of her confinement.  She alleges that she "was handcuffed with zip ties, blindfolded, and threatened with a gun," and that her captors blindfolded her when she entered

---

[1] The direct testimony of witnesses was submitted by affidavit and they were orally cross-examined with a right of redirect.

the hotel.  (<u>Id.</u> ¶¶ 51-52.)  She alleges that she was "forced by her traffickers" to work from the hotel and "was prohibited from speaking with staff . . . ."  (<u>Id.</u> ¶ 52.)  The traffickers also seized her phone and identification.  (<u>Id.</u>)

      4.      B.H.'s captors posted online advertisements for commercial sex on www.backpage.com without her consent, and she "was also sent by her traffickers to walk the prostitution-prone track and service the buyers from the track of the Quality Inn Fort Jackson Maingate."  (<u>Id.</u> ¶ 53.)  She alleges that her traffickers "controlled her" by making her dependent on crack cocaine, pistol-whipping her and withholding food and water.  (<u>Id.</u> ¶ 54.)  She alleges that the traffickers blindfolded her when she entered the hotel, and that once she was in the room, they disrobed her and tied her hands and feet to the bed.  (<u>Id.</u> ¶ 56.)

      5.      B.H. also asserts that certain circumstances of her confinement should have alerted Choice and others that she was being trafficked at the hotel.  "There were sounds from the various assaults that were loud enough for hotel staff and patrons to hear."  (<u>Id.</u> ¶ 54.)  B.H. alleges that she remained at the Quality Inn for approximately three weeks "to service the buyers of commercial sex she met on the track and that responded to the online website posts. . . .  The foot traffic was constant, voluminous and obvious."  (<u>Id.</u> ¶ 55.)  She alleges that her traffickers often paid for the room one night at a time and always paid in cash.  (<u>Id.</u> ¶ 56.)  Upon checkout, numerous used condoms were scattered across the room.  (<u>Id.</u> ¶ 57.)  She alleges that she suffered prominent and visible injuries that were observable to hotel staff and patrons but that she was not freed from her traffickers until a law-enforcement sting took place.  (<u>Id.</u> ¶¶ 58-59.)

      6.      B.H. asserts that Choice practices "willful blindness" toward incidents of sex trafficking at its hotels.  (<u>Id.</u> ¶¶ 46-47.)  She alleges that Choice failed to implement its own anti-sex trafficking policies, failed to provide adequate employee training and education, and did not

take adequate measures to prevent sex trafficking at its businesses despite knowing that incidents of trafficking had occurred at Quality Inns throughout the United States.  (Id. ¶ 47.)  B.H. alleges that such failings are pervasive throughout the hotel industry.  (Id. ¶¶ 19-45.)

7.      The B.H. Complaint also alleges that Choice "knew, or should have known" that B.H. was being trafficked at the hotel based on the steady flow of traffic to the room, her blindfolding in public, and her repeated visits to the hotel while exhibiting signs of malnourishment.  (Id. ¶¶ 62-66.)  She alleges that Choice "knowingly or negligently" aided and participated in her trafficking because the work of sex traffickers provides a steady income stream to its budget-hotel brands, and that Choice benefited from an ongoing reputation for privacy, discretion and the facilitation of commercial sex.  (Id. ¶¶ 65-72.)  She further alleges that Choice intentionally failed to train employees and managers about how to identify human trafficking or sexual exploitation in order to minimize costs and to maximize occupancy rates. (Id. ¶¶ 72-73.)

8.      B.H.'s complaint asserts two causes of action.  Count One asserts that Choice violated the William Wilberforce Trafficking Victims Protection Reauthorization Act of 2008 (the "TVPRA"), 18 U.S.C. § 1595, and that Choice "had a statutory obligation not to benefit financially from a venture that they knew, or should have known" was forcibly coercing a person to engage in commercial sex.  (Id. ¶¶ 75-79.)  Count Two alleges that Choice engaged in the facilitation of sexual abuse under South Carolina law.  (Id. ¶¶ 80-84.)

9.      B.H. filed an Amended Complaint on March 23, 2020.  (PX S.)  The Amended Complaint alleges the same two causes of action, and asserts, among other things, that Choice "enabled, harbored, held, facilitated, and financially benefited" from the sex trafficking of B.H. (Id. ¶ 10.)  It alleges Choice's "marked failure as innkeepers to exercise diligence consistent with

a duty of care," and asserts that diligence "would have led Choice to discover the horrific acts

that were being committed at their brand hotel."  (Id. ¶ 11.)  Like the initial complaint, it details

the brutality inflicted on B.H. and alleges that the "traffickers controlled her by making her

dependent on crack cocaine and punishing her with physical violence every time she did not

conform to their abundant rules."  (Id. ¶¶ 71-93.)  Also like the initial complaint, it asserts that

her "trafficker[s] kept her captive at the Quality Inn for days," that she "was prohibited from

speaking with staff," that traffickers seized her phone and identification, and that traffickers

forcibly tied her to a bed.  (Id. ¶¶ 74, 78, 88.)  It also alleges that the foot traffic going to her

room was "constant, voluminous and obvious," and that her injuries "were observed by hotel

staff."  (Id. ¶¶ 86, 91.)  B.H. repeatedly alleges that Choice "knew, or should have known," that

she was being trafficked in the hotel, and that it "knowingly or negligently" permitted its

premises to be used for the trafficking of B.H.  (Id. ¶¶ 94-99.)

   10. On January 19, 2021, the parties to the B.H. Action filed a stipulation of dismissal

without prejudice, with each party to bear their own costs.  (PX U.)

   11. The Quality Inn Fort Jackson Maingate hotel is operated by Maniben.

(Stipulation of Fact ¶ 3.)[2]  Choice's relationship with Maniben is governed by a franchise

agreement.  (DX 1.)  The agreement provides that the franchisee "must purchase" general

commercial liability insurance "protecting you and naming us [i.e., Choice] . . . as Additional

Insureds . . . from and against all types of liabilities, including personal injury and property

damage . . . ."  (Id. § 12(a)(1).)  The insurance "must include coverages for . . . personal injury

liability . . . ."  (Id.)  The agreement requires Maniben to "purchase and maintain, at your

expense," a commercial general liability policy that includes "the costs and expenses of the

---

[2] The parties' stipulations of fact are set forth in the Joint Pretrial Order.  (Docket # 73.)

defense . . . of injury or damage, without exception, from or in any way related to the operation

or activity conducted under this Agreement and/or of the Hotel . . . ."  (Id. § 12(b)(2).)

12.     Starr issued two comprehensive general liability policies to Maniben, which

named Choice as an additional insured.  (Fact Stip. ¶¶ 5, 8.)  Comprehensive General Liability

Policy No. SIJJML007199-00 was effective from June 10, 2012 through June 10, 2013.  (PX A.)

Comprehensive General Liability Policy No. SIJJML0141336-00 was effective from June 10,

2013 through June 10, 2014.  (PX B.)

13.     At trial, the parties agreed that both policies are relevant because B.H.'s

complaint does not allege a precise date range for the trafficking incident.  (Trial Tr. 78; B.H.

Compl't ¶ 49 (alleging that events occurred "[i]n 2013"); Am. B.H. Compl't ¶¶ 71-72 (same).)

For the purposes of adjudicating Starr's duty to defend, the language of the two policies is

identical in all relevant respects.

14.     Each policy contains an endorsement titled "ADDITIONAL INSURED –

GRANTOR OF FRANCHISE."  (PX A at 01686; PX B at 00663.)  The endorsement lists

"Choice Hotels Intl, C/O Wells Fargo Ins Services" as an additional insured.  (Id.)  The parties

do not dispute that Choice is an insured under the two policies.

15.     Each policy has a coverage limit of $1 million per occurrence.  (PX A at 01652;

PX B at 00619.)  Coverage A applies to bodily injury and property damage.  (PX A at 01666-71;

PX B at 00643-48.)  Coverage B applies to personal and advertising injury.  (PX A at 01671-72;

PX B 00648-49.)

16.     Coverage A states in part:

> We will pay those sums that the insured becomes legally obligated
> to pay as damages because of "bodily injury" or "property damage"
> to which this insurance applies.  We will have the right and duty to
> defend any "suit" seeking those damages.  However, we will have

- 6 -

> no duty to defend the insured against any suit seeking damages for "bodily injury" or "property damage" to which this insurance does not apply.

(PX A at 01666; PX B at 00643.)

17.     Coverage B contains the same language, as applied to a "personal and advertising injury":

> We will pay those sums that the insured becomes legally obligated to pay as damages because of "personal and advertising injury" to which this insurance applies.  We will have the right and duty to defend any "suit" seeking those damages.  However, we will have no duty to defend the insured against any suit seeking damages for "personal and advertising injury" to which this insurance does not apply.

(PX A at 01671; PX B at 00648.)

18.     Under Coverage B, "Personal and advertising injury" is defined to include "[f]alse arrest, detention or imprisonment . . . ."  (PX A at 01679; PX B at 00656.)

19.     At trial, both parties agreed that, unless an exclusion applies, Starr has a duty to defend Choice in the <u>B.H.</u> Action.  (Trial Tr. 4, 12.)

20.     The policies contain an endorsement titled "ABUSE OR MOLESTATION EXCLUSION" (the "Abuse or Molestation Exclusion").  (PX A at 01688; PX B at 00665.)  Starr urges that B.H.'s claims fall within the exclusion, and that it therefore does not have a duty to defend Choice.  The exclusion states:

> The following exclusion is added to Paragraph **2., Exclusions** of **Section 1 – Coverage A – Bodily Injury And Property Damage Liability** and Paragraph **2., Exclusions** of **Section I – Coverage B – Personal And Advertising Injury Liability:**
>
> This insurance does not apply to "bodily injury," "property damage," or "personal and advertising injury" arising out of:

1.     The actual or threatened abuse or molestation by anyone of any person while in the care, custody or control of any insured, or

2.     The negligent:
a. Employment;
b. Investigation;
c. Supervision;
d. Reporting to the proper authorities, or failure to report; or
e. Retention;

of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1. above.

(Id.)

21.     In January 2020, Starr received notice of Choice's demand to defend and indemnify it in the B.H. Action.  (Fact Stip. ¶ 13; PX D.)

22.     A March 18, 2020 letter written by North American Risk Services, a third-party claims administrator for Starr, denied the request.  (Fact Stip. ¶ 14; PX E.)  The letter stated in part:

> Due to the exclusion for Abuse and Molestation in the Starr policies, Starr does not agree to participate in Choice Hotels' defense or indemnity in connection with the referenced Lawsuit.  Starr further reserves its rights as set forth in this letter.
>
> *     *     *
>
> The Abuse or Molestation Exclusion applies to the Lawsuit.  B.H. alleges she was both "abused" an "molested" by the traffickers and by the "customers" who visited the hotel and forced B.H. to perform sexual acts.  Based on the allegations in the Complaint, it appears B.H. was in the "care" of the Named Insured, Maniben, at the time these acts occurred.
>
> Accordingly, Starr is denying coverage for the Lawsuit on the basis of the Abuse or Molestation Exclusion.

(PX E; emphasis in original.)

23.     The parties agree that New York law governs this dispute.  (Trial Tr. 3.)  There is federal subject matter jurisdiction based on the complete diversity of the parties.  (Compl't ¶¶ 2-4.)

24.     "Where the terms of an insurance policy are clear and unambiguous, interpretation of those terms is a matter of law for the court."  Town of Harrison v. Nat'l Union Fire Ins. Co. of Pittsburgh, Pa., 89 N.Y.2d 308, 316 (1996).  At pretrial proceedings, Starr urged that all relevant policy language is unambiguous.  Choice took the position that the policy language is potentially ambiguous but struggled to articulate the ambiguity.  (See, e.g., 12/8/20 Tr. at 3, 7-8; 3/23/21 Tr. at 7-9, 11-12, 18-19.)  In their written trial submissions and trial presentations, no party has urged that the Abuse or Molestation Exclusion or any other relevant policy language is ambiguous.

25.     "[I]t is well settled that an insurer's duty to defend its insured is exceedingly broad and an insurer will be called upon to provide a defense whenever the allegations of the complaint suggest a reasonable possibility of coverage."  BP Air Conditioning Corp. v. One Beacon Ins. Grp., 8 N.Y.3d 708, 714 (2007) (quotation marks and alterations omitted).  "'[T]he insured's right to representation and the insurer's correlative duty to defend suits . . . are in a sense 'litigation insurance' expressly provided by the insurance contract' no matter how baseless the allegations contained in the complaint may be."  Bovis Lend Lease LMB Inc. v. Garito Contracting, Inc., 65 A.D.3d 872, 875 (1st Dep't 2009) (quoting Servidone Constr. Corp. v. Security Ins. Co. of Hartford, 64 N.Y.2d 419, 423-24 (1985)).

26.     "'The duty to defend [an] insured[ ] . . . is derived from the allegations of the complaint and the terms of the policy.  If [a] complaint contains any facts or allegations which bring the claim even potentially within the protection purchased, the insurer is obligated to

defend.'"  BP Air Conditioning, 8 N.Y.3d at 714 (quoting Technicon Elec. Corp. v. American

Home Assur. Co., 74 N.Y.2d 66, 73 (1989)).  "A duty to defend is triggered by the allegations

contained in the underlying complaint.  The inquiry is whether the allegations fall within the risk

of loss undertaken by the insured '[and, it is immaterial] that the complaint against the insured

asserts additional claims which fall outside the policy's general coverage or within its exclusory

provisions.'"  Id. (alterations in original; quoting Town of Massena v. Healthcare Underwriters

Mut. Ins. Co., 98 N.Y.2d 435, 444 (2002)); accord Axis Surplus Ins. Co. v. GTJ Co., 139 A.D.3d

604, 604-05 (1st Dep't 2016) ("'a liability insurer has a duty to defend its insured in a pending

lawsuit if the pleadings allege a covered occurrence,' even if 'facts outside the four corners of

those pleadings indicate that the claim may be meritless or not covered.'") (quoting Fitzpatrick v.

American Honda Motor Co., 78 N.Y.2d 61, 63 (1991)).

27.     "'To be relieved of its duty to defend on the basis of a policy exclusion, the

insurer bears the heavy burden of demonstrating that the allegations of the complaint cast the

pleadings wholly within that exclusion, that the exclusion is subject to no other reasonable

interpretation, and that there is no possible factual or legal basis upon which the insurer may

eventually be held obligated to indemnify the insured under any policy provision."  Auto. Ins.

Co. of Hartford, Connecticut v. Damadian, 178 A.D.3d 489, 490 (1st Dep't 2019) (quoting

Frontier Insulation Contractors, Inc. v. Merchants Mut. Ins. Co., 91 N.Y.2d 169, 175 (1997)).

Exclusions are strictly construed "and must be read narrowly."  Id.

28.     "Conversely, if the allegations interposed in the underlying complaint allow for

no interpretation which brings them within the policy provisions, then no duty to defend exists."

Atlantic Mutual Ins. Co. v. Terk Techs. Corp., 309 A.D.2d 22, 29 (1st Dep't 2003).  "[T]he court

should not impose a duty to defend on an insurer 'through a strained, implausible reading of the

complaint 'that is linguistically conceivable but tortured and unreasonable.'" Id. at 30 (quoting

Northville Indus. Corp. v. National Union Fire Ins. Co. of Pittsburgh, 89 N.Y.2d 621, 634-635

(1997)).  "In the context of a policy exclusion, the phrase arising out of is unambiguous, and is

interpreted broadly to mean 'originating from, incident to, or having connection with.'  To

determine the applicability of an 'arising out of' exclusion, the Court of Appeals had adopted a

'but for' test.  This test is defined as follows: '[I]f the plaintiff in an underlying action or

proceeding alleges the existence of facts clearly falling within such an exclusion, and none of the

causes of action that he or she asserts could exist but for the existence of the excluded activity or

state of affairs, the insurer is under no obligation to defend the action.'"  Country-Wide Ins. Co.

v. Excelsior Ins. Co., 147 A.D.3d 407, 409 (1st Dep't 2017) (internal citations omitted; quoting

Scottsdale Indemnity Co. v. Beckerman, 120 A.D.3d 1215, 1219 (2d Dep't 2014)).

     29.    Starr urges that it does not have a duty to defend Choice because the trafficking of

B.H. was an incident of "actual or threatened abuse or molestation by anyone of any person

while in the care, custody or control of any insured" and therefore falls within the Abuse or

Molestation Exclusion.  Starr urges that, based on the complaints in the B.H. Action, B.H. was in

the "care" of Choice and/or Maniben "by virtue of her presence on the premises, her status as a

business invitee, and as a result of the affirmative undertaking of Maniben and/or Choice."

(Starr Trial Mem. at 15.)  Starr specifically urges that B.H.'s physical presence on the premises

of the Quality Inn as the guest of a paying guest placed her within the "care" of the insureds, and

that the term "care" should be construed as coextensive to a common law duty of care.  (See,

e.g., Trial Tr. 183 ("Physical presence with their knowledge in a situation where there is palpable

foreseeability and therefore a duty of care."); 205 ("You can't get away from the duty of care

being a piece of while in the care.").)

30.     Starr's interpretation equating "care" with the duty of care requires a strained reading of the Abuse or Molestation Exclusion and is rejected.

31.     The legal duty of care is a well-established, widely understood concept in the law of negligence.  If the Abuse or Molestation Exclusion applied to any person owed a legal duty of care by an insured, the policy language would have said so.  Paragraph 1 of the Abuse or Molestation Exclusion does not reference a legal duty of care, and applies instead to "any person . . . in the care, custody or control" of an insured.  "Under the principles of ejusdem generis, a rule of construction, the meaning of a word in a series of words is determined by the company it keeps.  In accordance with that rule, a series of specific words describing things or concepts of a particular sort are used to explain the meaning of a general one in the same series."  242-44 E. 77th St., LLC v. Greater New York Mut. Ins. Co., 31 A.D.3d 100, 103-04 (1st Dep't 2006) (citations and quotation marks omitted).  The inclusion of the word "care" alongside the similar words "custody" and "control," without accompanying language stating that those terms should be understood as legal duties, supports the conclusion that "care" should be afforded a plain and ordinary meaning and not be interpreted as coextensive to a legal duty of care.

32.     Courts have often looked to dictionaries for guidance on the meaning of the terms care, custody and control.  See Valley Forge Ins. Co. v. Field, 670 F.3d 93, 99 (1st Cir. 2012). ("In this context, the plain meaning of 'care' i[n] the Abuse or Molestation Exclusion here accords with the dictionary definition that being 'in the care of' includes 'charge, supervision, management: responsibility for or attention to safety and well-being.'") (quoting Webster's Third New International Dictionary 338 (1993)); see also Holiday Hosp. Franchising, Inc. v. AMCO Ins. Co., 983 N.E.2d 574, 579 (Ind. 2013) (reviewing dictionary definitions of "care," "custody" and "control").  The 2002 edition of Webster's Third New International Dictionary includes the

definition quoted in <u>Valley Forge</u>, citing the care of doctors and churches as examples.  It also defines care as "serious attention," especially "attention accompanied by caution . . . or responsibility."  <u>Id.</u>  Black's Law Dictionary includes a definition of "care" as "[s]erious attention; heed."  <u>Black's Law Dictionary</u> (7th ed. 1999).  Its primary definition of "custody" is "[t]he care and control of a thing or person for inspection, preservation, or security," followed by narrower legal definitions, and it defines "control" as "[t]he direct or indirect power to direct the management and policies of a person or entity . . . ."  <u>Id.</u>

33.    Abuse or molestation exclusions "have generally been found to be unambiguous in the face of attacks on various parts of the language used, and the insureds in these cases have included medical or therapeutic care providers, health care centers, summer camps, schools and preschools, job training programs, churches, and the like."  <u>Valley Forge</u>, 670 F.3d at 98.  An unambiguous insurance policy "must be accorded its plain and ordinary meaning."  <u>Castlepoint</u>, 179 A.D.3d at 508 (quotation marks and brackets omitted).  The relevant coverage provisions and the Abuse or Molestation Exclusion are unambiguous.

34.    The Court concludes that the word "care," as used in the Abuse or Molestation Clause, refers to the insured's "charge, supervision, management: responsibility for or attention to safety and well-being," or to a person given the insured's "serious attention" or "heed."  This is consistent with the plain language of the exclusion and the policy as a whole.

35.    This approach to defining the word "care" is also consistent with the "common sense" approach taken by New York authorities when defining the word "care" in other types of liability policies.  <u>See</u>, <u>e.g.</u>, <u>Pattengell v. Welsh</u>, 81 A.D.2d 831, 831 (2d Dep't 1981) (adopting "[a] commonsense definition of the term 'in the care of'" to mean "some responsibility for the infant, either in a monetary or disciplinary way."); <u>Lang v. Hanover Ins. Co.</u>, 49 A.D.3d 1068,

1068-69 (3d Dep't 2008) (a twenty-year-old "boarder" residing in the home of a friend's family

was not "in the care of" the insureds under a homeowners insurance policy because the insureds

"did not undertake any financial, disciplinary or emotional responsibility for him" and he

managed his own financial and day-to-day needs); see also City of New York v. Philadelphia

Indem. Ins. Co., 54 A.D.3d 709-10 (2d Dep't 2008) ("Insurance contracts are read in light of

'common speech' and are to be interpreted according to the reasonable expectations and

purposes of ordinary businesspeople when making ordinary business contracts.") (internal

citations and quotation marks omitted).

36.    The allegations of B.H.'s two complaints and her theories of liability do not turn

exclusively on B.H. falling within the "care" of any insured.  B.H. describes violent and absolute

control exercised by her traffickers, and asserts, among other things that she was "was prohibited

from speaking with staff . . . ."  (B.H. Compl't ¶ 52; B.H. Am. Compl't ¶ 78.)  B.H.'s allegations

also are not exclusively premised on any insured's knowledge of the trafficking venture or its

knowledge of B.H.'s captivity by that venture.  B.H. repeatedly asserts that Choice "knew, or

should have known" about her trafficking at the Quality Inn.  (B.H. Compl't ¶¶ 5, 10(d), 62-64;

B.H. Am. Compl't ¶¶ 5, 13(d), 94-96; emphasis added.)

37.    The allegations that Choice "should have known" about the trafficking venture

are consistent with the text of the TVPRA, which does not require that a defendant have actual

knowledge of a trafficking venture in order to be civilly liable:

> An individual who is a victim of a violation of this chapter may bring
> a civil action against the perpetrator (or whoever knowingly
> benefits, financially or by receiving anything of value from
> participation in a venture which that person knew or should have
> known has engaged in an act in violation of this chapter) in an
> appropriate district court of the United States and may recover
> damages and reasonable attorneys fees.

18 U.S.C. § 1595(a) (emphasis added).  "Thus, liability under TVPRA requires that '(1) the person or entity must knowingly benefit, financially or by receiving anything of value, (2) from participating in a venture, (3) that the person knew or should have known has engaged in an act in violation of this chapter.'"  S.J. v. Choice Hotels Int'l, Inc., 473 F. Supp. 3d 147, 152-53 (E.D.N.Y. 2020) (Cogan, J.) (quoting A.C. v. Red Roof Inns, Inc., 2020 WL 3256261, at *4 (S.D. Ohio June 16, 2020)); see also M.A. v. Wyndham Hotels & Resorts, Inc., 425 F. Supp. 3d 959, 971 (S.D. Ohio 2019) ("Defendants need not have actual knowledge of the sex trafficking in order to have participated in the sex trafficking venture for civil liability under the TVPRA, otherwise the 'should have known' language in § 1595(a) would be meaningless.").

38.     The text of B.H.'s original and amended complaints is consistent with alleging civil liability against a defendant that financially benefited from trafficking that it "should have known" occurred, but for which it lacked actual knowledge.  B.H.'s allegations include a claim of liability under the TVPRA based on activity that was not within the actual knowledge of Choice or Maniben, but instead activity that Choice "should have known . . . ."  The two complaints also describe steps taken by B.H.'s traffickers to prevent the discovery of the trafficking scheme and her captivity, including the prohibition against speaking with staff and their seizure of her phone and identification.  The alleged trafficking venture undertaken by third parties without the knowledge of either insured cannot reasonably be characterized as "arising out of" abuse or molestation that occurred while B.H. was within an insured's "care, custody or control . . . ."  Starr therefore has not demonstrated that the Abuse or Molestation Exclusion relieves it of its duty to defend.  Auto. Ins. Co. of Hartford, 178 A.D.3d at 490 ("To be relieved of its duty to defend on the basis of a policy exclusion, the insurer bears the heavy burden of

demonstrating that the allegations of the complaint cast the pleadings wholly within that exclusion . . . .").

39.     To be sure, as Starr has often emphasized, B.H.'s two complaints also contain allegations that assert Choice's direct knowledge and participation in the trafficking venture. (See, e.g., Am. Compl't ¶ 10 (alleging that "Choice conspired, enabled, and otherwise worked together in the abuse and exploitation of Plaintiff in keeping her invisible.").)  But the duty to defend attaches if the "complaint contains any facts or allegations which bring the claim even potentially within the protection purchased," BP Air Conditioning, 8 N.Y.3d at 714, and allegations attributing knowledge and participation to Choice are brought alongside allegations that the traffickers concealed B.H.'s presence and the assertion that Choice "should have known" of the trafficking activities.  Because B.H. alleges TVPRA liability based on a venture that "should have" been known to Choice but was concealed by the traffickers, the allegations do not fall entirely within the Abuse or Molestation Exclusion.

40.     Additional allegations in the B.H. Action describe incidents and events that could not have occurred while B.H. was under the care of any insured.  B.H. alleges that she initially was lured to the hotel after a date with one of her traffickers and that, at a later point, she fled the premises for several days, was abducted off the street and returned to the hotel by her three traffickers.  (B.H. Compl't ¶¶ 4, 51-52; B.H. Am. Compl't ¶¶ 75-76.)  These same individuals "sent" B.H. "to walk the prostitution-prone track" near the hotel site.  (B.H. Compl't ¶ 53; B.H. Am Compl't ¶ 80.)  These allegations are expressly incorporated into B.H.'s causes of action. (B.H. Compl't ¶¶ 75, 80; B.H. Am. Compl't ¶¶ 107, 112.)  Such incidents, which occurred off the site of the Quality Inn, cannot reasonably be said to have occurred while B.H. was under the "care custody or control" of an insured.

41.     B.H.'s complaints also use the term "false imprisonment" to describe her confinement, alleging that "[w]hile victimized by her traffickers, B.H. was subject to repeated instances of rape, physical abuse, verbal abuse, exploitation, psychological torment, kidnapping, and false imprisonment at the Defendant's hotel."  (B.H. Compl't ¶ 48; see also B.H. Am. Compl't ¶¶ 8, 71.)  As Starr notes, B.H. did not bring a cause of action for false imprisonment. (Trial Tr. 11.)  However, from the face of B.H.'s complaints and construing the duty to defend broadly in favor of Choice as the insured, the claimed circumstances of her false imprisonment is closely intertwined with her kidnapping and trafficking.  Injury caused by false imprisonment is expressly defined as a "personal injury" under Coverage B of the policies.  (PX A at 01680; PX B at 00656.)  Because the allegations referencing false imprisonment fall outside the Abuse or Molestation Exclusion, Starr also has a duty to defend Choice.  The Village of Piermont v. Am. Alternative Ins. Corp., 151 F. Supp. 3d 438, 451 (S.D.N.Y. 2015) (insurer had a duty to defend insured in an underlying proceeding because "the false imprisonment allegations do not fit under either of the 'sexual abuse' or 'sexual harassment' definitions.").

42.     Starr has urged that the Abuse or Molestation Exclusion should be understood to have a bright-line application, and should apply whenever a hotel guest suffered abuse or molestation on the hotel premises or while under the hotel's duty of care.  (See Trial Tr. 179-83; Starr Trial Mem. 15.)  But the authorities it cites in support have carefully examined the injured person's relationship to the insured and the allegations of the underlying pleadings, including the extent the insured was directly involved in overseeing the victim's welfare.  These authorities do not suggest such a bright-line rule for deciding whether a victim was under the "care, custody or control" of an insured, and instead reflect a variety of context-specific considerations.  Presence on an insured's premises may be relevant to whether that person is "in the care, custody or

control" of the insured but it is not a necessary element.  A person may be on an insured's premises and not be in "care, custody or control" of the insured, and, conversely, the person may be off the insured's premises and yet be "in the care, custody or control" of the insured.

43.     "The abuse and molestation exclusion originated in the 1980s in response to an increasing number of far-reaching sexual abuse claims against organizations that alleged harm to children arising from negligent hiring or supervision, rather than from the abuse itself." Dorchester Mut. Ins. Co. v. Krusell, 150 N.E.3d 731, 741 (Mass. 2020).  Many, though not all, cases that have reviewed the "care, custody or control" language have involved harm inflicted upon children in institutional or recreational settings.  See, e.g., Nunez v. Mariners Temple Baptist Church, 901 N.Y.S.2d 908 (N.Y. Sup. Ct. N.Y. Cnty. 2009) (two teenage employees of a church summer camp who alleged verbal and physical sexual harassment were not in the "care, custody or control of any insured" because of their status as employees); Valley Forge, 670 F.3d at 96 (child who received "psychiatric, mental health, rehabilitation, and family stabilization services" from a non-profit organization was within that organization's care, and the abuse or molestation exclusion applied because facility frequently provided social work services to a child who suffered severe physical abuse from adopted parents); Starr Indem. & Liab. Co. v. Boys & Girls Club of Carbondale, 2012 WL 5843159, at *8 (S.D. Ill. Nov. 19, 2012) ("'care, custody or control' is generally construed as meaning immediate possession," and the abuse or molestation exclusion did not apply when plaintiffs' claims included acts that occurred off the premises of the insured facility); Children's Aid Soc. of Montgomery Cnty. v. Great Am. Ins. Co., 1995 WL 251374, at *5 (E.D. Pa. Apr. 28, 1995) (child placed into an abusive foster care setting was under the care, custody or control of a child welfare organization that agreed to "provide child care

services" that "enhance the dignity of the child" and "maintained the power . . . to generally monitor the care and environment of the child, and to exercise control over that environment.").

44.     The "abuse or molestation" exclusion has also been considered in the context of incidents at hotels.  Starr principally relies on Holiday Hospitality Franchising, Inc. v. AMCO Insurance Co., 983 N.E.2d 574 (Ind. 2013), a case in which a hotel employee molested a young boy on the premises.  In that case, the child was staying at a hotel with a friend of his mother when a hotel employee used an electronic key to enter the locked room at night and molested him.  Id. at 580.  The Indiana Supreme Court concluded that because of the victim's status as a hotel guest, the hotel owed the victim a duty of care by law, and that the victim therefore fell within the hotel's care.  Id.  It also stated that "[t]his is not a bright-line declaration that any guest of any motel is ipso facto 'in the care of' that motel and we recognize that the facts of this case are not the same as those from other jurisdictions applying this type of exclusion."  Id. at 581 n.9.[3]

45.     Holiday Hospitality was distinguished by Millers Capital Insurance Co. v. Vasant, 2018 WL 5295899 (D. Md. Oct. 25, 2018), which involved claims against Choice and another defendant that were brought by victims of a trafficking and prostitution ring.  The insurer disclaimed a duty to defend based on an exclusion seemingly identical to the one at issue here. Id. at *1.  The underlying complaint in that case alleged that perpetrators kidnapped women, advertised their prostitution services online, and forced them to engage in sex acts, often while drugged, and that the perpetrators used the insureds' hotel rooms as "their primary

---

[3] Another authority cited by Starr, 12th St. Gym, Inc. v. Philadelphia Indemnity Insurance Co., 2006 WL 1652690, at *2-3 (Pa. Ct. Com. Pl. June 12, 2006), does not shed meaningful light on the definition of "care, custody or control."  There, plaintiff alleged that she was sexually assaulted by a gym's massage therapist.  With little elaboration, the court concluded that the victim fell within the "care, custody or control" of the gym, and described in greater detail the insured's negligent employment and oversight of the masseur who was allegedly responsible for the assault.  Id.

headquarters." Id. at *2.  The court concluded that under Maryland law, a hotel did not have a

duty to a guest's invitee unless it had knowledge of that person's presence:

> [C]an an innkeeper be carrying on the "function of watching,
> guarding, or overseeing" without knowing about the guest?  This
> Court concludes that the answer to that question is "no" – there is
> simply no legal basis to find that an innkeeper has care, custody or
> control of an unknown guest in the hotel.  Even if the circumstances
> are such that the innkeeper may have been negligent for not being
> aware of the unknown guest or that abuse was occurring on its
> premises, such circumstances do not bring the unknown guest under
> the innkeepers' care, custody, or control.

Id. at *6.  In evaluating the insurer's duty to defend, the court looked beyond the four corners of

the underlying complaint, and considered deposition testimony from the underlying action,[4] in

which the victims testified that they were quickly moved into the hotel, stayed briefly, were not

observed by staff, and did not see "clients" during their stay.  Id. at *6-7.  "Based on this

testimony, the wrong-doers actively prevented Econo Lodge from knowing about the victims,

deliberately keeping them hidden, so there is no evidence that the hotel was ever aware of the

victims being on its premises.  Thus, the hotel cannot have had the victims under its 'care,

custody or control.'"  Id. at *7.  Millers Capital also distinguished "the particular combination of

facts" in Holiday Hospitality, specifically that the victim "was molested by a hotel employee,

while staying in a rented guest room, behind a door locked by an electronic key provided by the

hotel."  Id. at *5.

46.     The authorities cited by Starr did not adopt the sort of bright-line, per se

construction that Starr proposes.  (Starr Trial Br. 15.)  Instead, several context-specific

formulations have been used to apply the exclusion's use of the word "care" in an abuse or

molestation exclusion clause, including "immediate possession," Carbondale, 2012 WL

---

[4] Under New York law, the duty to defend is evaluated based on the four corners of the complaint in the underlying action for which the duty is invoked.  BP Air Conditioning Corp., 8 N.Y.3d at 714.

5843159, at *8; the provision of long-term therapy and social services support, <u>Valley Forge</u>, 670 F.3d at 96 and <u>Children's Aid Soc.</u>, 1995 WL 251374, at *5; a common law duty of care, <u>Holiday Hospitality</u>, 983 N.E.2d at 580; and degree knowledge of the victim's presence on the hotel premises, <u>Millers Capital</u>, 2018 WL 5295899, at *6-7.

47.    Starr separately urges that paragraph 2 of the Abuse or Molestation Exclusion provides an alternative basis to disclaim its duty to defend, arguing that paragraph 2 creates an exclusion based on the failure to investigate or report an incident of abuse or molestation.  (Starr Trial Mem. 23-24.)  Paragraph 2 excludes coverage arising out of "[t]he negligent: a. Employment; b. Investigation; c. Supervision; d. Reporting to the proper authorities, or failure to report; or e. Retention; of a person for whom any insured is or ever was legally responsible and whose conduct would be excluded by Paragraph 1. above."  (PX A at 01688; PX B at 00665.) This exclusion is expressly directed to a person within an insured's legal responsibility – such as an employee or volunteer – who engages in an act of abuse or molestation, as reflected by language addressing the insured's oversight or failure to report actions "of a person . . . whose conduct would be excluded by Paragraph 1 . . . ."  (<u>Id.</u>)  It does not create an exclusion based on an insured's failure to investigate or report a victim's circumstances, and instead speaks to negligence related to the "conduct" "of a person" under the insured's legal responsibility.  Starr's expansive reading of paragraph 2 is contrary to its plain language.

48.    Having considered all of the evidence and arguments of the parties, including those not expressly addressed herein, the Court concludes that the allegations in the <u>B.H.</u> Action do not fall entirely within the Abuse or Molestation Exclusion.  The Court further concludes that Starr has wrongfully disclaimed its duty to defend choice in the <u>B.H.</u> Action.  Judgment will therefore be entered for Choice.

CONCLUSION.

        The Court concludes that Starr wrongfully disclaimed its duty to defend Choice. Within seven days, Choice shall file a proposed judgment.  Starr may submit a written response within three business days thereafter.  Within twenty-one days, Choice may file its application for attorneys' fees.  Rule 54(d)(2), Fed. R. Civ. P.

        The Clerk is directed to terminate the motions at docket numbers 37, 39, 47, 61 and 68.

        SO ORDERED.

P. Kevin Castel
United States District Judge

Dated: New York, New York
      June 16, 2021